# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
#### 1:20-cv-42-MOC-WCM

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| WINSTON REED INVESTMENTS LLC and MARK N. PYATT, aka DANIEL RANDOLPH, | ) ) ) ) ) |
| Defendants. | ) ) |

**ORDER OF DEFAULT JUDGMENT, PERMANENT INJUNCTION, RESTITUTION, CIVIL MONETARY PENALTIES, AND ANCILLARY EQUITABLE RELIEF AGAINST DEFENDANT WINSTON REED INVESTMENTS LLC**

## I. INTRODUCTION

On February 10, 2020, the Commodity Futures Trading Commission ("Commission" or "CFTC") filed its Complaint [ECF No. 2] in the above-captioned action against Winston Reed Investments, LLC ("WRI") and Mark N. Pyatt ("Pyatt") (collectively "Defendants") seeking injunctive and other equitable relief for violations of the Commodity Exchange Act (the "Act"), 7 U.S.C. §§ 1 *et seq*., and Commission Regulations ("Regulations"), 17 C.F.R. §§ 1.1 *et seq*.

The Complaint alleges that from at least April 2017 through at least February 2019 ("Relevant Period"), WRI, by and through its principal, Mark N. Pyatt, also known as Daniel

Randolph, and Pyatt directly, fraudulently solicited and received approximately $200,000 from at least nineteen individuals ("pool participants"), who are not eligible contract participants ("ECPs"), as defined in 7 U.S.C. § 1a(18) (2018). According to the Complaint, Defendants solicited and received these funds in connection with pooled trades in commodity futures contracts ("futures") and retail foreign exchange transactions ("forex"), among other things. As alleged in the Complaint, Defendants misappropriated most of pool participants' funds for business expenses and personal use, and to make Ponzi-like payments to other pool participants; made false and misleading representations to pool participants; and issued false reports that misrepresented trading profits purportedly achieved by Defendants on behalf of pool participants.

The Complaint further alleged that Pyatt is liable as a control person for WRI's violations of the Act and Regulations pursuant to 7 U.S.C. § 13c(b) (2018), and that because Pyatt's violations of the Act and Regulations occurred within the course and scope of his employment, agency, or office, WRI is liable as principal for Pyatt's violations pursuant to 7 U.S.C. § 2(a)(1)(B) (2018), and 17 C.F.R. § 1.2 (2019).

The Complaint sought to enjoin Defendants' alleged unlawful acts and practices, to compel their compliance with the Act and Regulations, and to enjoin them from engaging in any commodity or forex related activities. In addition, the Complaint sought civil monetary penalties, restitution, and remedial ancillary relief.

## II.    PROCEDURAL HISTORY

The Commission filed its Complaint on February 10, 2020. [ECF No. 2]. Plaintiff served Pyatt and WRI with a summons and the Complaint on February 19 and 22, 2020,

respectively. [ECF Nos. 8 and 9]. Neither Defendant timely filed an answer or otherwise responded to the Complaint.

Thereafter, pursuant to Fed. R. Civ. P. 55(a), Plaintiff moved for entry of default against WRI and Pyatt. [ECF Nos. 10 and 12]. The Clerk entered defaults as to WRI and Pyatt on March 19 and 24, 2020, respectively. [ECF Nos. 11 and 13].

On August 21, 2020, Plaintiff moved for entry of default judgment against WRI and Pyatt and submitted a supporting memorandum of law. [ECF Nos. 16 and 17]. On September 8, 2020, Pyatt submitted a letter to the Court objecting to Plaintiff's motion for default judgment. [ECF No. 18]. Thereafter, Pyatt and the Commission negotiated and agreed to a proposed consent order, which the Court approved on December 21, 2020. [ECF No. 24]. WRI was not a party to the Consent Order and has not appeared in this litigation.

On January 4, 2021, the Commission submitted a revised proposed order of in support of its motion for default judgment against WRI. [ECF No. 26]. The Court has considered carefully the Complaint, the allegations of which are well-pleaded and hereby taken as true, the Motion, and the Memorandum. Being fully advised in the premises, the Court hereby:

**GRANTS** the Commission's Motion and enters the following Findings of Fact and Conclusions of Law finding WRI liable as to all violations as alleged in the Complaint and finding Pyatt liable as a controlling person for WRI's violations. Accordingly, the Court now issues the following Order which determines that WRI violated 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6b(a)(2)(A)-(C), 6o(1)(A), (B) (2018); and 17 C.F.R. § 5.2(b)(1)-(3) (2019), imposes on the WRI a permanent injunction, and orders Defendants, jointly and severally, to pay restitution, and civil monetary penalties.

# III.    FINDINGS OF FACT

## A.    The Parties

Plaintiff Commodity Futures Trading Commission is an independent federal regulatory agency charged by Congress with responsibility for administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1-26 (2018), and the Regulations promulgated thereunder, 17 C.F.R. pts. 1-190 (2019).

Defendant Winston Reed Investments, LLC is a limited liability company formed in April 2017 and organized under the laws of North Dakota.  Its principal place of business is in Williston, North Dakota.  WRI has never been registered with the CFTC in any capacity.

Defendant Mark Nicholas Pyatt a/k/a Daniel Randolph is a natural person currently in custody in the vicinity of Asheville, North Carolina.  During a portion of the Relevant Period, he resided in Waynesville, North Carolina.  He served as the vice president and investment consultant for, and held a power of attorney on behalf of, WRI.  Pyatt has never been registered with the CFTC in any capacity.

## B.    The Purpose and Organization of WRI

Pyatt established WRI to facilitate his trading of various financial instruments, including futures and forex.  Pyatt, on behalf of WRI, solicited prospective pool participants to trade futures and forex through the WRI pool.  In more than one solicitation, Pyatt identified himself as "Daniel Randolph" when speaking with prospective pool participants.

When prospective pool participants agreed to deposit funds into the WRI pool, Pyatt had the prospective pool participants sign an agreement with WRI.  That agreement identified "Daniel Randolph" as WRI's President and Pyatt as its "Vice President, Investment Consultant

and POA."  Pyatt controlled WRI's day-to-day operations and was responsible for, among other things, trading pool participants' funds.

In soliciting pool participants, Defendants made no attempt to determine if they were ECPs.  In fact, most, if not all, of Defendants' pool participants were not ECPs.

## C.     WRI's Acceptance of Pool Participant Funds

During the Relevant Period, WRI accepted $276,850 from pool participants for the purpose of trading futures and forex.  These pool participant funds were typically in increments of $5,000.  Each increment was referred to as a "contract."

Pursuant to agreements signed by pool participants, WRI promised to deposit pool participant funds into one of two accounts at "Chase Bank / First International Bank & Trust." WRI promised that those funds would then be deposited into an account at TD Ameritrade. Under the agreements, pool participants had the option of depositing funds directly into the TD Ameritrade account.

## D.     WRI's Representations About Trading and Promised Returns

WRI, through Pyatt, told pool participants that it managed at least $1,000,000, which Pyatt used to trade futures and some stocks at TD Ameritrade, that Pyatt developed a trading algorithm, and that Pyatt was a successful trader.  WRI, through Pyatt, also told pool participants that Pyatt traded profitably, generating, in one instance $30,000 profit on a $10,000 placement in six months and $240,000 profit in one year, and, in a second instance, $130,000 profit on an initial investment of $20,000.  The agreement pool participants signed at Pyatt's direction stated that "[t]he low average expected return on investments across the board is 15% per month."

These representations were false.  WRI's representations, made through Pyatt, about the amount of funds WRI managed and the profitability of WRI's trading are contradicted by the evidence.

**E.     WRI's Representations and Omissions About the Use of Pool Participant Funds**

The agreement signed by pool participants provided that "all funds are pooled into one account" and "the purpose of trading all funds together is to give us a higher volume to trade with."  The agreement also stated that pool participant funds would be used to trade:  "[Pyatt] will be trading 'futures' and 'forex' in a day-trading format and will specialize in energy related stocks.  Gold, NASDAQ and oil."  Under the agreement pool participants signed, WRI charged each participant $300 per month for market analysis.  The agreement further provided that the fee for WRI's services would be 10% of all gains.  Under the agreement, all pool participant funds were to be used to trade.  Based on their interactions with Pyatt, pool participants believed that all of the funds placed with WRI would be traded on their behalf.

Pyatt did not tell prospective pool participants that their funds would be used to pay his business and personal expenses.

**F.     WRI Used Only a Fraction of Pool Participant Funds To Trade**

WRI opened two accounts at TD Ameritrade in April 2017, one futures account and one securities account.  These accounts were opened in the name of "Daniel Randolph."

As noted above, WRI accepted $276,850 from pool participants.  Most of those funds were initially deposited into a TD Ameritrade securities account.  WRI did not trade in the TD Ameritrade securities account.  Moreover, during the Relevant Period, WRI transferred only a fraction of the $276,850 provided by pool participants from the TD Ameritrade securities account into the TD Ameritrade futures account.  Transfers into the TD Ameritrade futures

account totaled only $13,416.68. WRI used the TD Ameritrade futures account to trade various futures contracts between April 2017 and February 2019.

**G.      WRI Misappropriated Pool Participant Funds To Make Periodic Payments to Other Pool Participants and To Pay Business and Personal Expenses**

WRI used pool participant funds to make Ponzi-like payments to other participants. Payments totaling $21,000 were made to various pool participants from the TD Ameritrade securities account.

As detailed below, for most of the Relevant Period, WRI was unprofitable trading pool participant funds. To the extent that WRI's trading generated profits, those profits were not sufficient to sustain the periodic payments to pool participants.

WRI also used pool participant funds to pay business and personal expenses. For example, payments were made from the TD Ameritrade securities account to American Airlines, Best Buy, Eddie Bauer, Pizza Hut, Prime Video, Smokey Mountain Cigars, Starbucks, Uber, Verizon Wireless, Walmart, and Zale's Outlet, among others.

**H.      WRI's Trading Was Not Profitable Overall**

The TD Ameritrade futures account was active between April 2017 and February 2019, a total of twenty-three months. WRI traded in the TD Ameritrade futures account during only fifteen of those twenty-three months. Trading during nine of those fifteen months resulted in realized losses totaling $15,081.66, while trading during the remaining six months resulted in realized gains totaling $1,664.98. Overall, trading in the TD Ameritrade futures account cumulatively resulted in a net loss of $13,416.68.

### I.     WRI Provided Statements to Pool Participants that
###         Did Not Accurately Reflect WRI's Trading Performance

WRI provided monthly reports to pool participants concerning activity in the WRI pool. These reports were typically transmitted to pool participants via a group email and typically referred to substantial profits.  For example, WRI's monthly report for September 2018 stated that trading resulted in a 36% profit for the month, that is, $1,800 profit per "contract."  WRI's monthly report for December 2018 stated that trading resulted in an 18.8% profit, that is, $941 profit per "contract."  A third monthly report transmitted by WRI claimed profits of 86.5%, that is, $4,327 per $5,000 contract, while a fourth claimed profits of 83.9%, that is, $4,195 per $5,000 contract.

The monthly reports provided by WRI to pool participants did not accurately reflect WRI's trading performance.

WRI also provided individual updates covering multiple months of account activity to at least two pool participants.  According to a report WRI sent via email to those pool participants, their initial placement of $10,000 yielded net profits of $24,035 in three months, and additional profits of $110,146 on the following six months.

The individual updates WRI provided to pool participants did not accurately reflect WRI's trading performance.

### J.     Defendants' Plans to Restart Trading

Pyatt reported purported catastrophic losses to pool participants in February 2019.  Pyatt also advised pool participants that all trading would be stopped pending review of the purported catastrophic loss. However, no such catastrophic losses occurred in the TDA futures account.  In August 2019, Pyatt approached at least three investors about restarting trading in the pool.

# IV.    CONCLUSIONS OF LAW

## A.    WRI's Failure to Properly Answer Warrants Entry of Default Judgment

Under Fed. R. Civ. P. 55(a), a default is entered when "a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend . . . ."  Fed. R. Civ. P. 55(a).  Upon entry of default, the defaulted party is deemed to have admitted all well-pleaded allegations of fact contained in the complaint.  *CFTC v. Prestige Capital Advisors, LLC*, No. 3:11-cv-431, 2013 WL 7224738, at *1 (W.D.N.C. Jan. 25, 2013) (granting default judgment where defendants failed to answer allegations of fraudulent solicitation, misappropriation, and issuance of false statements).

Entry of default judgment under Fed. R. Civ. P. 55(b) is left to the sound discretion of the trial court.  *CFTC v. PMC Strategy, LLC*, 903 F. Supp. 2d 368, 375 (W.D.N.C. 2012) (Mullen, J.) (granting default judgment where a commodity pool operator and its control person engaged in fraudulent solicitation, misappropriated pool participant funds and issued false statements).

 "In considering a motion for default judgment, the Court accepts as true the well-pleaded factual allegations in the Complaint as to liability."  *Maaco Franchisor SPV, LLC v. Cruce*, No. 3:18-cv-361, 2019 WL 5295702, at *4 (W.D.N.C. Oct. 18, 2019) (citing *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001); *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987)).  However, "the entry of 'default is not treated as an absolute confession of liability by the defendant of his liability or of the plaintiff's right to recover.'"  *Maaco*, 2019 WL 5295702, at *4 (quoting *Ryan*, 253 F.3d at 780).  Rather, the Court must "determine whether the well-pleaded allegations in [the] Complaint support the relief sought."  *Id.* (quoting *Ryan*, 253 F.3d at 780).

Regarding damages, the Court "cannot accept Plaintiff's factual allegations as true and must make an "independent determination." *Id.* (quoting *CGI Finance, Inc. v. Johnson*, No. ELH-12-1895, 2013 WL 1192353, at *1 (D. Md. Mar. 21, 2013)). "Although the Court must make an independent determination regarding damages, an evidentiary hearing is not required; rather the Court may rely on affidavits or documentary evidence in the record to determine the appropriate sum." *Prestige Capital Advisors*, 2013 WL 7224738, at *1 (ECF No. 27-2 at p. 7) (citing *J&J Sports Productions, Inc. v. Romenski*, 845 F. Supp. 2d 703, 706 (W.D.N.C. 2012) (Conrad, C.J.)); *see also CFTC v. Capitalstreet Financial, LLC,* No. 3:09-cv-387, 2012 WL 79758, at *1 (W.D.N.C. Jan. 11, 2012) (Conrad, C.J.) (taking as true the factual allegations of the complaint which were well-pleaded and issuing a final order of permanent injunction that also provided for restitution, a civil monetary penalty and ancillary equitable relief pursuant to 7 U.S.C. § 13a-1); *PMC Strategy*, 903 F. Supp. 2d at 380–84 (same).

In this matter, a Clerk's Entry of Default has been entered against WRI pursuant to the Commission's request. As such, in accordance with Fed. R. Civ. P. 55(b)(2) and 8(b)(6), the allegations in the Complaint will be taken as true and default judgments are hereby entered against WRI.

**B.     Jurisdiction and Venue**

This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2018) (federal question jurisdiction) and 28 U.S.C. § 1345 (2012) (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). 7 U.S.C. §§ 2(c)(2)(C) and13a-l(a) (2018), authorize the Commission to seek injunctive relief against any person whenever it shall appear that such person has engaged, is

engaging, or is about to engage in any act or practice that violates any provision of the Act or any rule, regulation, or order promulgated thereunder.

Venue properly lies with the Court pursuant to 7 U.S.C. § 13a-1(e) (2018), because Defendants resided in this District, Defendants transacted business in this district, and the acts and practices in violation of the Act occurred within this District.

## C.     WRI Violated the Act and Regulations

### 1.     WRI Violated 7 U.S.C. §§ 6b(a)(1)(A)-(C) and 6b(a)(2)(A)-(C) (2018), and 17 C.F.R. § 5.2(b)(1)-(3) (2019)

7 U.S.C. §§ 6b(a)(1)(A)-(C), (a)(2)(A)-(C) make it unlawful for any person to (A) cheat or defraud or attempt to cheat or defraud another person, (B) willfully to make a false report or statement to another person, or (C) willfully to deceive or attempt to deceive another person by any means whatsoever in connection with any futures or retail forex transaction.

17 C.F.R. § 5.2(b)(1)-(3) makes it unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce, to (1) cheat or defraud or attempt to cheat or defraud another person, (2) willfully to make a false report or statement to another person, or (3) willfully to deceive or attempt to deceive another person by any means whatsoever in connection with any forex transaction.

WRI violated 7 U.S.C. §§ 6b(a)(1)(A)-(C), (a)(2)(A)-(C) and 17 C.F.R § 5.2(b)(1)-(3) by misappropriating pool participants' funds, by making material misrepresentations with scienter, and by willfully issuing false statements.

#### a.     WRI Misappropriated Funds

During the Relevant Period, WRI accepted $276,850 from pool participants for the purpose of trading futures and forex.  During the same period, WRI made payments of $21,000 to various pool participants.  Thus, WRI misappropriated $255,850.

Misappropriation of client and pool participant funds constitutes "willful and blatant" fraud. *CFTC v. Noble Wealth Data Info. Servs., Inc.*, 90 F. Supp. 2d 676, 687 (D. Md. 2000), *aff'd sub nom. CFTC v. Baragosh*, 278 F.3d 319 (4th Cir. 2002).

### b. WRI Made Fraudulent Misrepresentations and Omissions and Issued False Statements

To establish liability for fraud based on misrepresentations and omissions, the Commission must prove that: (1) a misrepresentation, misleading statement, or omission was made; (2) that the misrepresentation, statement or omission was material; and (3) that it was made with scienter. *R.J. Fitzgerald & Co., Inc.*, 310 F.3d at 1328 (citations omitted). "Whether a misrepresentation has been made depends on the 'overall message' and the 'common understanding of the information conveyed.'" *Id.* (citing *Hammond v. Smith Barney Harris Upham & Co.*, CFTC No. 86-R131, 1990 WL 282810, at *4 & n.12 (Mar. 1, 1990)). The Commission has proven all three elements.

### i. WRI's Misrepresentations

WRI falsely represented to pool participants that Pyatt was a successful trader who could generate substantial profits and that pool participants' funds would be used to trade futures and forex for their benefit. In fact, WRI's claims of trading success were highly misleading, and only a fraction of pool participants' funds was used to trade.

### ii. WRI Acted with Scienter

The scienter element is established when an individual's acts are performed "with knowledge of their nature and character," *Wasnick v. Refco, Inc.*, 911 F.2d 345, 348 (9th Cir. 1990) (internal quotation marks and citation omitted), and that the defendant acted with more than "mere negligence, mistake or inadvertence." *Id.* This standard may be met by demonstrating that a defendant committed the alleged wrongful acts intentionally or with

reckless disregard for his duties under the Act. *See Drexel Burnham Lambert, Inc. v. CFTC*, 850 F.2d 742, 748 (D.C. Cir. 1988) (finding that recklessness is sufficient to satisfy scienter requirement). To prove that conduct is intentional, the Commission need only show that a defendant's actions were "intentional as opposed to accidental." *Lawrence v. CFTC*, 759 F. 2d 767, 773 (9th Cir. 1985).

WRI acted with scienter. First, WRI, through Pyatt, engaged in misappropriation of pool participant funds to pay WRI's business and personal expenses and to make Ponzi payments to pool participants. Second, Pyatt exercised complete control over WRI. He was solely responsible for developing WRI's trading strategy, and directing the trading. He was responsible for the agreements with pool participants and prepared the false monthly and individual reports transmitted to pool participants. Thus, WRI knew that its representations of trading success and disposition of funds were false.

### iii.    WRI's Misrepresentations Were Material

A statement is material if "it is substantially likely that a reasonable investor would consider the matter important in making an investment decision." *CFTC v. Driver*, 877 F. Supp. 2d 968, 977 (C.D. Cal. 2012) (granting summary judgment to CFTC against CPO), *aff'd* 585 Fed. App'x 366 (9th Cir. Oct. 7, 2014). Any fact that enables customers to assess independently the risk inherent in their investment and the likelihood of profit is a material fact. *Driver*, 877 F. Supp. 2d at 978 ("Driver's representations and omissions were false and material because they impacted the pool participants' decisions to invest, remain in the pool, or make additional investments."). Any fact that enables investors to assess independently the risk inherent in their investment and the likelihood of profit is a material fact. *In re Commodities Int'l Corp.*, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,943, at 44,563-64 (CFTC Jan. 14, 1997).

Moreover, a material misrepresentation or omission is a violation whether or not it induces customer action or inaction; rather, it is sufficient that a material misrepresentation or omission is made to "attempt to cheat or defraud" or willfully to "attempt to deceive" a person. *Comm'n v. Int'l Fin. Servs.*, 323 F. Supp. 2d 482, 502 (S.D.N.Y. 2004) (because the Act makes actionable not only fraud, but the "attempt to cheat or defraud," it may be "unnecessary to show reliance even in a private action – for an attempt that fails (perhaps because no one relied on it) is nonetheless a violation" (quoting *Slusser*, 210 F.3d at 786)).

WRI's misrepresentations were material. A reasonable individual would want to know, among other things, that his/her funds were not being used to trade as promised, but rather were misappropriated by WRI and that Pyatt was not a highly profitable trader.

### c. WRI Issued False Statements

WRI violated 7 U.S.C. §§ 6b(a)(1)(B) and 6b(a)(2)(B) of the Act when they provided periodic written reports to pool participants. The pool-wide reports typically referred to substantial gains each month. The reports WRI provided to pool participants did not accurately reflect WRI's trading results using pool participants' funds.

### 2. WRI Violated 7 U.S.C. § 6*o*(1)(A), (B) (2018)

7 U.S.C. § 6*o*(1)(A), (B) (2018), in relevant part, makes it unlawful for a Commodity Trading Advisor ("CTA") or Commodity Pool Operator ("CPO"), by use of the mails or any other means of interstate commerce, directly or indirectly, to: (A) employ any device, scheme, or artifice to defraud any customer; or (B) engage in any transaction, practice, or course of business that operates as a fraud or deceit upon any customer. "[7 U.S.C. § 6*o*(1)] broadly prohibits fraudulent conduct by a [CTA]" and "applies to all [CTAs] whether registered, required to be registered, or exempted from registration." *CFTC v. Weinberg*, 287 F. Supp. 2d 1100,

1107–08 (C.D. Cal. 2003) (citing *CFTC ex rel. Kelley v. Skorupskas*, 605 F. Supp. 923, 932

(E.D. Mich. 1985)).  The same fraudulent conduct that violates Section 4b of the Act also

violates Section 4*o*(1) of the Act.

7 U.S.C. § 1a(11) (2018) defines a CPO as, among other things, any person engaged in a

business that is of the nature of a commodity pool and who solicits, accepts, or receives from

others, funds, securities, or property for the purpose of trading commodity interests.  For forex, a

CPO is defined in 17 C.F.R. § 5.1(d)(1) (2019), as "any person who operates or solicits funds,

securities, or property for a pooled investment vehicle that is not an ECP as defined in section

1a(18) of the Act, and that engages in retail forex transactions."

7 U.S.C. § 1a(18)(A)(xi) (2018), in relevant part, defines an ECP to mean an individual

"acting for its own account —who has amounts invested on a discretionary basis, the aggregate

of which is in excess of—(I) \$10,000,000; or (II) \$5,000,000 and who enters into the agreement,

contract, or transaction in order to manage the risk associated with an asset owned or liability

incurred, or reasonably likely to be owned or incurred, by the individual."  Most, if not all, of the

pool participants were not ECPs.

7 U.S.C. § 1a(12) (2018), defines a CTA as any person who for compensation or profit,

engages in the business of advising others as to the value or advisability of trading in, among

other things, futures contracts or forex transactions.  Similarly, 17 C.F.R. § 5.1(e)(1) (2019)

defines a CTA as "any person who exercises discretionary trading authority or obtains written

authorization to exercise discretionary trading authority over any account for or on behalf of any

person that is not an [ECP] in connection with retail forex transactions."

During the Relevant Period, WRI acted as a CPO by soliciting and accepting funds for a pooled investment vehicle from non-ECPs for the purpose of engaging in trading futures and forex.

**E.    WRI Is Liable for the Violations of Its Agent, Pyatt**

Under 7 U.S.C. § 2(a)(1)(B) (2018) and 17 C.F.R. § 1.2 (2019), a principal is strictly liable for the violations of its officials, agents, or other persons acting for it within the scope of their employment or office.  *Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966 (7th Cir. 1986) ("[W]e have no doubt that section 2(a)(1) imposes strict liability on the principal . . . provided, of course, as the statute also states expressly, that the agent's misconduct was within the scope or (equivalently but more precisely) in furtherance of the agency.").  Pyatt was an official, employee, or agent of WRI and acted within the scope of his employment or office.  Thus, WRI is liable for Pyatt's violations of the Act and Regulations described above and in the Complaint.

**F.    Pyatt Is Liable as a Controlling Person for WRI's Violations**

7 U.S.C. § 13(b) (2018), states that a controlling person of an entity is liable for the violations of that entity, provided that the controlling person knowingly induced, directly or indirectly, the violations, or provided that the controlling person did not act in good faith.  "A fundamental purpose of Section [13(b)] is to allow the Commission to reach behind the corporate entity to the controlling individuals of the corporation and to impose liability for violations of the Act directly on such individuals as well as the corporation itself."  *R.J. Fitzgerald & Co., Inc.*, 310 F.3d at 1334 (internal quotation marks and citation omitted).

To establish controlling person liability under Section 13(b) of the Act, the Commission must show both:  (1) control; and (2) lack of good faith or knowing inducement of the acts constituting the violation.  *See In re First Nat'l Trading Corp.*, CFTC No. 90-28, 1994 WL

378010, at *11 (July 20, 1994), *aff'd without opinion sub nom*. *Pick v. CFTC*, 99 F.3d 1139 (6th Cir. 1996). The Commission has proven both elements here.

To establish the first element, control, a defendant must possess general control over the operation of the entity principally liable. *See, e.g., R.J. Fitzgerald*, 310 F.3d at 1334 (recognizing an individual who "exercised the ultimate choice-making power within the firm regarding its business decisions" as a controlling person). The Commission must also show that a defendant possessed specific control, which is "the power or ability to control the specific transaction or activity upon which the primary violation was predicated." *Monieson v. CFTC*, 996 F.2d 852, 860 (7th Cir. 1993) (internal quotation marks and citation omitted).

In addition to control, the Commission must show the controlling person knowingly induced, directly or indirectly, the acts constituting the violation, or did not act in good faith. To show knowing inducement, the Commission must show that a defendant had actual or constructive knowledge of the core activities that constituted the violation of the Act or the Regulations, and allowed the activities to continue. *R.J. Fitzgerald*, 310 F.3d at 1334; *Spiegel*, 1988 WL 232212, at *7. To show lack of good faith, the Commission must show that a defendant failed to maintain a "reasonably adequate system of internal supervision and control" or did not oversee the system "with any reasonable diligence." *Monieson*, 996 F.2d at 860 (7th Cir. 1993) (quoting *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992)).

As to Pyatt's general and specific control, he was the vice president, investment consultant and had power of attorney for WRI, and directed every aspect of the fraudulent scheme. He directly made misrepresentations to pool participants, provided false information to pool participants, and misappropriated pool participants' funds. Thus, Pyatt had general control over WRI and specific control over the misconduct alleged in the Complaint.

In addition, Pyatt knowingly induced the violations because he individually had knowledge of the wrongdoing and allowed it to continue. *See Spiegel*, 1988 WL 232212, at *7 ("[W]e reject the view that a controlling person must know that the acts at issue amount to a violation in order to be held to have 'knowingly' induced the acts constituting the violation. . . . [I]f the controlling person knowingly induces acts that amount to a violation, he will not escape liability merely because he acted in good faith."). Thus, Pyatt is liable for WRI's violations as a controlling person.

## V.     ORDER FOR RELIEF

### A.     Permanent Injunction

7 U.S.C. § 13a-1(a) provides that:

> (a) Whenever it shall appear to the Commission that any registered entity or other person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule, regulation or order thereunder . . . the Commission may bring an action in the proper district court of the United States . . . to enjoin such act or practice, or to enforce compliance with this chapter, or any rule, regulation or order thereunder . . .

Based upon and in connection with the conduct described above, pursuant to 7 U.S.C. § 13a-1, WRI, and any other person or entity associated with it, is permanently restrained, enjoined and prohibited from directly or indirectly:

1.     Cheating or defrauding, or attempting to cheat or defraud, other persons;  issuing or causing to be issued false reports;  and willfully deceiving or attempting to deceive other person in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or forex contract that is made, or to be made, for or on behalf of, or with, any other person in violation of , 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6b(a)(2)(A)-(C), (2018), and 17 C.F.R. 5.2(b)(1)-(3) (2019);

2.      Using the mails or other means or instrumentalities of interstate commerce to directly or indirectly employ a device, scheme, or artifice to defraud clients or prospective clients, or engage in transactions, practices, or courses of business which operate as a fraud or deceit upon clients or prospective clients in violation of 7 U.S.C. § 6*o*(1) (2018);

3.      Trading on or subject to the rules of any registered entity (as that term is defined in 7 U.S.C. § 1a(40);

4.      Entering into any transactions involving "commodity interests"  (as that term is defined in 17 C.F.R. § 1.3(2019)) for WRI's own personal accounts or for any account in which it has a direct or indirect interest;

5.      Having any commodity interests traded on its behalf;

6.      Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

7.      Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

8.      Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9) (2019); and/or

9.      Acting as a principal (as that term is defined in 17 C.F.R. § 3.1(a) (2019)), agent or any other officer or employee of any person registered, or exempted from registration, or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9) (2019).

**B.      Restitution**

This Court has the authority to award restitution to the victims of Defendants' fraud.

7 U.S.C. 13a-1(d)(3) states, in relevant part, that:

> . . . the Commission may seek, and the court may impose, on a proper showing, on any person found in the action to have committed any violation, equitable remedies including— **(A)** restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses). . .

The object of restitution is to restore the status quo and return the parties to the positions they occupied before the transactions at issue occurred. *Prestige Capital Advisors*, 2013 WL 7224738, at *1 (ECF No. 27-2 at p. 18) (imposing restitution for violations of Sections 4b and 4o of the Act) (citing *Porter*, 328 U.S. at 402 (equitable restitution consists of "restoring the status quo and ordering the return of that which rightfully belongs to the purchaser or tenant")).

"Restitution is measured by the amount invested by customers less any refunds made by the [D]efendants." *Prestige Capital Advisors*, 2013 WL 7224738, at *1 (ECF No. 27-2 at p. 19) (quoting *Noble Wealth*, 90 F. Supp. 2d at 693). *See also CFTC v. Marquis Fin. Mgmt. Systems, Inc.*, 2005 WL 3752232, at *6 (E.D. Mich. 2005) (ordering restitution in the amount of net customer deposits); *Rosenberg*, 85 F. Supp. 2d at 455 (ordering restitution in amount of customer deposits).

Here, WRI fraudulently solicited $276,850 from pool participants, and returned $21,000 to some pool participants. Accordingly, the proper measure of restitution is $255,850, the total amount of losses incurred by WRI pool participants.

## C. Civil Monetary Penalty

This Court has the authority to impose a CMP against Defendants. 7 U.S.C. § 13a-1(d)(1) states, in relevant part, that

> (d)(1) . . . the Commission may seek and the court shall have jurisdiction to impose, on a proper showing, on any person found in the action to have committed any violation . . . a civil penalty in

the amount of not more than the greater of $100,000[1] or triple the
monetary gain to the person for each violation . . . .

The Court is free to fashion a civil monetary penalty appropriate to the gravity of the
offense and sufficient to act as a deterrent.  *Miller v. CFTC*, 197 F.3d 1227, 1236 (9th Cir. 1999);
*see also CFTC v. Hayes*, 2007 WL 858772, at *5 (E.D. Va. Mar. 13, 2007) (imposing penalty of
triple the monetary gain).  "In determining how extensive the fine for violations of the Act ought
to be, courts and the Commission have focused upon the nature of the violations."  *Capitalstreet
Financial, LLC*, 2012 WL 79758, at *15 (*quoting Noble Wealth*, 90 F. Supp. 2d at 694).

Conduct that violates the core provisions of the Act, such as fraud, should be considered
extremely serious.  *Prestige Capital Advisors*, 2013 WL 7224738, at *1 (ECF No. 27-2 at p. 22);
*see also JCC, Inc. v. CFTC*, 63 F.3d 1557, 1571 (11th Cir. 1995).  In *JCC, Inc.*, the U.S. Court of
Appeals for the Eleventh Circuit upheld the district court order imposing a civil monetary
penalty, finding that "[c]onduct that violates the core provisions of the Act's regulatory system –
such as manipulating prices or defrauding customers *should be considered very serious* even if
there are mitigating facts and circumstances."  *JCC, Inc.*, 63 F.3d at 1571 (internal quotation
marks and citation omitted) (emphasis added).  In the case at hand, there are no mitigating facts
or circumstances.  Instead, Defendants were blatant and malicious in their fraudulent conduct.

The Commission has requested that the Court impose a serious and significant sanction
against to Defendants and order them to pay a CMP of triple the monetary gain to Defendants.
The Court agrees that serious and significant sanctions should be imposed, and the Court orders
WRI and Pyatt to pay, jointly and severally, $727,299.96 which represents triple the monetary

---

[1]  For the time period at issue in the case at bar, the maximum civil monetary penalty ("CMP")
that may be ordered is $182,031 for each violation of the Act committed on or after November 2,
2015, or triple the monetary gain to the Defendant, whichever is higher.  *See* 17 C.F.R.
§ 143.8(a)(1)(iv) (2012).

gain to Defendants, *i.e.*, triple the amount of money placed by pool participants ($276,850), less

funds returned to customers ($21,000) and funds actually used to trade ($13,416.68) (the "CMP

Obligation").

WRI and/or Pyatt shall pay the CMP Obligation immediately and post-judgment interest

shall accrue on the CMP Obligation beginning on the date of entry of this Order and shall be

determined by using the Treasury Bill rate prevailing on the date of this Order pursuant to 28

U.S.C. § 1961 (2006).

WRI and/or Pyatt shall pay the CMP Obligation by electronic funds transfer, or by U.S.

Postal money order, certified check, bank cashier's check, or bank money order.  If payment is to

be made other than by electronic funds transfer, the payment shall be made payable to the

Commodity Futures Trading Commission and sent to the address below:

> MAC/ESC/AMK326
> Commodity Futures Trading Commission
> Division of Enforcement
> 6500 S. MacArthur Blvd.
> HQ Room 181
> Oklahoma City, OK 73169
> (405) 954-6569 office
> (405) 954-1620 fax
> 9-AMC-AR-CFTC@faa.gov

If payment is to be made by electronic funds transfer, WRI and/or Pyatt shall contact

Marie Thorne or her successor at the above address to receive payment instructions and shall

fully comply with those instructions.  WRI and/or Pyatt shall accompany payment of the penalty

with a cover letter that identifies the Defendant and the name and docket number of the

proceedings.  The WRI and/or Pyatt shall simultaneously transmit copies of the cover letter and

the form of payment to the Director, Division of Enforcement, Commodity Futures Trading

Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, DC 20581, and the

Chief, Office of Cooperative Enforcement, Division of Enforcement, at the same address.

## VI.    MISCELLANEOUS PROVISIONS

**Equitable Relief:**  The injunctive and equitable relief provisions of this Order shall be

binding upon WRI and upon any persons who are acting in the capacity of agent, officer,

employee, servant, attorney, successor and/or assign of WRI, and upon any person acting in

active concert or participation with WRI who receives actual notice of this Order by personal

service or otherwise.

**Notices:**  All notices required to be given to the Commission by any provision in this

Order shall be sent certified mail, return receipt requested, as follows:

> Richard A. Glaser
> Deputy Director
> Commodity Futures Trading Commission
> Division of Enforcement
> Three Lafayette Centre
> 1155 21st Street, NW
> Washington, DC 20581

**Continuing Jurisdiction of this Court:**  This Court shall retain jurisdiction of this case

to assure compliance with this Order and for all other purposes related to this action.

Signed: February 2, 2021

Max O. Cogburn Jr.
United States District Judge